Filed 2/3/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TWO JINN, INC.,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>GOVERNMENT PAYMENT SERVICE, INC.,<br><br>     Defendant and Respondent. | A136984 & A137479<br><br>(Sonoma County<br>Super. Ct. No. SCV-247285) |

**I.**

**INTRODUCTION**

Two Jinn, Inc., doing business in California as Aladdin Bail Bonds (Aladdin), a licensed bail agent, brought this action to enjoin Government Payment Services, Inc. (GPS) from engaging in bail agent activities in violation of state licensing and regulatory requirements. The superior court sustained a demurrer to Aladdin's claim for false advertising under the federal Lanham Act, 15 U.S.C. section 1125(a). Thereafter, the court granted a defense motion for summary judgment on Aladdin's remaining claims alleging violations of California's Unfair Competition Law (the UCL), Business and Professions Code section 17200 et seq., and seeking declaratory relief. In this appeal from the resulting judgment, Aladdin challenges both the demurrer and summary judgment rulings.

We conclude that (1) Aladdin lacks standing to maintain a UCL claim; (2) undisputed evidence submitted by the parties shows that the commercial activities of GPS associated with its processing of credit or debit card transactions for cash bail

1

payments do not require GPS to obtain a bail bond license; and therefore, GPS is not in violation of the UCL; and (3) the second cause of action in Aladdin's second amended complaint fails to state a Lanham Act claim, as a matter of law. Therefore, we affirm the judgment entered in favor of GPS below.

## II.

## STATEMENT OF FACTS

### A. The Complaint Allegations

In December 2010, Aladdin filed a second amended complaint and petition for writ of mandate (the SAC) in which it alleged the following facts: Aladdin does business in California as Aladdin Bail Bonds, a "duly licensed" bail agent. GPS purports to be a "financial services entity," but actually conducts activities "relating to arranging pretrial release for incarcerated detainees accused of committing both felonies and misdemeanors, including but not limited to solicitation and transaction of bail within the meaning of the [Insurance] Code." Both Aladdin and GPS "provide pretrial release services to detainees in exchange for a monetary compensation." Aladdin performs that service through the posting of surety bonds, while GPS allegedly performs that service by posting cash bail for detainees.

According to the SAC, GPS solicits clients and posts cash bail for detainees pursuant to "contractual arrangements" with county sheriffs in Sonoma, Solano, Marin, Monterey, and Ventura. Aladdin attached copies of these contracts as exhibits to the SAC. For example, Exhibit B is an "Agreement for Processing Credit or Debit Card For Cash Bail Payments," which was executed by GPS's CEO and the Sheriff-Coroner of Sonoma County in June 2009. According to that document, GPS agreed to "process credit/debit card transaction requests for cash bail payments for persons in the custody of the Sheriff upon their (or their agents[']) telephone or [I]nternet request." GPS agreed these services would be available "at all times," and that it would process payments "in real-time and, upon credit/debit card approval, [it would] transmit a payment receipt document to an authorized agent of the Sheriff" for review

2

and approval. Upon notice of approval, GPS would then "transmit all funds for the cash bail payments electronically."

The SAC alleged that these contractual arrangements are unlawful for three primary reasons. First, GPS's business activities allegedly require a valid license under Insurance Code section 1800, subdivision (a), which states that "[a] person shall not in this state solicit or negotiate in respect to execution or delivery of an undertaking of bail or bail bond by an insurer, or execute or deliver such an undertaking of bail or bail bond unless licensed as provided in this chapter . . . ." Aladdin alleged GPS does not have this required license.

Second, GPS's contractual arrangements with county sheriffs allegedly violate other provisions of the Insurance Code regulating the conduct of bail agents by, among other things, (1) giving GPS exclusive access to detainees wishing to arrange pretrial release via credit or debit card payments; (2) authorizing GPS to advertise its services throughout the jails and areas where bail payment can be made; and (3) obligating GPS to pay sheriffs a percentage of its revenue from the sale of its services.

Third, Aladdin alleged that advertisements GPS posts in county jails are false, misleading and confusing to consumers because it employs the terms "Government," and "GOV" in combination with a state capitol dome logo to create the false impression that GPS's services "are performed either by a government agency" or are performed by an entity which is "sponsored by or affiliated with the government."

Aladdin incorporated these general allegations into four causes of action, the first three against GPS for unlawful business practices under the UCL, false advertising under the Lanham Act, and declaratory relief to resolve a dispute about whether GPS's activities require a bail agent license.

The fourth cause of action was a petition for writ of mandate against the California Department of Insurance (the Department). Aladdin added this claim to the SAC after the superior court sustained a demurrer to the first amended complaint and

3

stayed proceedings pursuant to the primary jurisdiction doctrine, finding that the Department's position regarding the nature of GPS's business was critical to a resolution of this case. In support of the mandate claim, Aladdin alleged that the California Insurance Commissioner (the Commissioner) was aware of GPS's unlawful activities, Aladdin had requested that the Department initiate an enforcement action, and the Commissioner "refused to initiate or pursue an enforcement action or otherwise attempt to enforce the [Insurance] Code with respect to Defendant's unlawful conduct."

## B.  The Department's Demurrer

In February 2011, the Commissioner filed a demurer to the fourth cause of action for a writ of mandate. Evidence supporting the demurrer included an October 2010 letter from the Department's general counsel to Aladdin's trial counsel in which the Department officially declined to "exercise primary jurisdiction or initiate an enforcement action" against GPS. The Department determined GPS was exempt from the Insurance Code license and regulatory requirements covering the transaction of bail in California under Government Code section 6159.

Section 6159, subdivision (b) states, in pertinent part:  "Subject to subdivisions (c) and (d), a court, city, county, city and county, or other public agency may authorize the acceptance of a credit card, debit card, or electronic funds transfer for any of the following:  [¶] (1) The payment for the deposit of bail for any offense not declared to be a felony or for any court-ordered fee, fine, forfeiture, penalty, assessment, or restitution. Use of a card or electronic funds transfer pursuant to this paragraph may include a requirement that the defendant be charged any administrative fee charged by the company issuing the card or processing the account for the cost of the transaction. . . ."

Subdivision (c) of section 6159 states that a "public agency desiring to authorize the use of a credit card, debit card, or electronic funds transfer pursuant to subdivision (b) shall obtain the approval of the governing body that has fiscal

4

responsibility for that agency." And subdivision (d) provides that, once the necessary approval is obtained, the agency may execute a contract "with one or more credit card issuers, debit card issuers, electronic funds transfer processors, or draft purchasers."

The Department interpreted this statute as permitting "counties and other public agencies to contract with companies for the payment by credit card, debit card or electronic funds transfer of nonfelony bail by arrestees." As the Department's counsel explained in his October 2010 letter, "[i]f a company has a valid contract under Section 6159 to process bail by credit card, the Department reads Section 6159 as preempting Insurance Code laws related to bail. For example, if a sheriff's office contracts with Bank of America to provide Visa and MasterCard services at a jail, we do not believe Bank of America must obtain a bail license from the Department."

On March 30, 2011, the superior court sustained the Department's demurrer to Aladdin's mandate claim without leave to amend. In reaching this decision, the court found that "[a]ny action that the Commissioner can take pursuant to Insurance Code § 790.03, et seq. is within the exercise of the Commissioner's discretion and cannot be compelled by a writ of mandamus." The court also found the Commissioner's decision to initiate an enforcement action was a matter of discretion which "cannot be compelled." (Citing Ins. Code, § 12921.1, subd. (a); *Schwartz v. Poizner* (2010) 187 Cal.App.4th 592.)

### C. GPS's Demurrer

On August 23, 2011, the court sustained GPS's demurrer to the SAC's second cause of action for false advertising without leave to amend. The court found that Aladdin failed to state a cause of action under the Lanham Act because the SAC did not identify any false statement of fact that GPS allegedly made. Instead, the theory alleged in the SAC was that GPS "uses 'Government' and/or the term 'Gov' and a capitol dome logo to imply that Gov is a governmental entity or approved by one."

In its order sustaining the demurrer, the court recognized that, although Aladdin labeled its second cause of action as a false advertising claim, the Lanham Act also

5

prohibits "false associations." However, the court found that a false association claim is substantively distinct from a false advertising claim with different elements and standing requirements that were not established by the factual allegations in the SAC.

### D. Summary Judgment

On September 19, 2012, the superior court granted a defense motion for summary judgment on the remaining causes of action in the SAC, the UCL and declaratory relief claims.[1] The court found that the summary judgment evidence established the following facts: GPS is an electronic funds transfer processor; it processes credit or debit card transactions for cardholders who deposit cash bail to a local government entity. It uses common industry practices to "make[] transfers by electronic means" of the cardholder's own funds. And, it provides these "electronic funds transfer processing services for the payment of cash bail from credit or debit cards" to sheriffs departments pursuant to contractual relationships with Sonoma County and several other California counties.

Pursuant to defense requests for judicial notice, the court also found that a company referred to as "EZ Card and Kiosk, LLC" is not a licensed bail agent and that it has contracts with Madera and Orange Counties to provide the same type of services GPS provides. The court also took judicial notice of the fact that the Department officially declined to pursue any action against GPS. Finally, the court took judicial notice of legislative history material pertaining to Government Code section 6159 which shows that the intent behind that statute was "to make it easier for people to pay fines, post bail and to alleviate time spent in jail."

Based on these facts, the court found that: (1) Aladdin does not have standing to bring a UCL claim because GPS's allegedly unfair business practices did not cause Aladdin to suffer an actual economic injury; (2) GPS's business activities do not

---

[1] The court also denied Aladdin's cross-motion for summary judgment, but that order is not challenged on appeal.

require that it comply with the bail agent license requirement and related regulations set forth in Insurance Code section 1800 et seq.; and (3) GPS's contracts with county sheriffs are authorized by Government Code section 6159.

### E. Judgment and Appeal

On November 29, 2012, the court entered judgment against Aladdin on both the SAC and GPS's cross-complaint for declaratory relief. In support of the judgment, the court set forth five findings: (1) Aladdin lacks standing to maintain a UCL claim; (2) Insurance Code section 1800 et seq. does not require that GPS obtain a bail bond license or otherwise regulate the defendant's activities; (3) GPS operates an electronic funds transfer processing system under Government Code section 6159; (4) GPS's conduct does not violate the UCL; and (5) the SAC's second cause of action fails to state a Lanham Act claim, as a matter of law. The judgment incorporates by reference the superior court orders sustaining the demurrer to the Lanham Act claim and granting GPS summary judgment. Aladdin timely appealed.[2]

## III.

## SUMMARY JUDGMENT

### A. Standard of Review and Issues on Appeal

"We review a summary judgment ruling de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. [Citation.] 'In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment.' [Citation.]" (*Bjork v. State Farm Fire & Casualty Co*. (2007) 157 Cal.App.4th 1, 5-6.) " 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving party bears

---

[2] Aladdin filed two notices of appeal, one from the September 2012 summary judgment order, and another from the November 2012 judgment. This court granted Aladdin's motion to consolidate those appeals.

the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish," ' the elements of his or her cause of action. [Citation.]" (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720.)

Aladdin contends the summary judgment must be reversed without providing any independent analysis of its declaratory relief claim. By focusing exclusively on the UCL cause of action, Aladdin implicitly concedes it cannot obtain declaratory relief if the UCL claim fails. Thus, we confine our review of the summary judgment rulings to the SAC's first cause of action alleging unlawful business practices in violation of the UCL.

"The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. [Citation.]' [Citations.]" (*Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 252 (*Drum*).) "The UCL sets out three different kinds of business acts or practices that may constitute unfair competition: the unlawful, the unfair, and the fraudulent. [Citations.]" (*Rose v. Bank of America, N.A.* (2013) 57 Cal.4th 390, 394.) " ' ". . . California courts have consistently interpreted the language of section 17200 broadly." ' [Citations.]" (*Wilson v. Hynek* (2012) 207 Cal.App.4th 999, 1007-1008.) Nevertheless, in addition to proving the elements of his or her claim, a private party must establish standing to bring a UCL action. (*Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1097-1098 (*Daro*).)

As reflected above, judgment was entered against Aladdin on its UCL claim because evidence produced in the summary judgment proceeding established that (1) Aladdin lacks standing; and (2) GPS's business activities are not unlawful or unfair under the theory alleged in the SAC. Aladdin disputes both of these findings.

**B. Aladdin Does Not Have Standing Under the UCL**

A "private person has standing to sue under the UCL only if that person has suffered injury and lost money or property 'as a result of such unfair competition.' [Citation.]" (*Daro*, *supra*, 207 Cal.App.4th at p. 1098, italics omitted.) To satisfy the

8

UCL standing requirement, the plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322 (*Kwikset*).)

### 1. Lost Customers

Aladdin contends that GPS's allegedly unfair business practices caused it economic injury when customers who would otherwise have used Aladdin's services used GPS's services instead. We disagree because the summary judgment evidence shows that any diversion of customers from Aladdin to GPS did not result from the fact that GPS does not have a bail bond license, or that it does not comply with other regulations governing the activities of licensed bail bond agents.

GPS produced evidence that it is not a bail bond agent, and thus, does not directly compete with Aladdin. It does not sell bail bonds to arrested individuals, work on behalf of any surety insurer, or post its own money on behalf of a detained person in order to secure his or her release. Instead, GPS operates an electronic funds transfer (EFT) service for processing credit and debit card payments of cash bail that are made to counties pursuant to Government Code section 6159.[3]

As reflected in our discussion of Aladdin's unsuccessful mandate claim against the Department, Government Code section 6159 authorizes counties to accept a credit card, debit card or other EFT as payment for the deposit of non-felony bail. Thus, this statute provides arrested and detained individuals with an alternative method of securing release without having to engage the services of a bail bond agent like Aladdin. As the superior court found, the legislative history evidence shows that the

---

[3] GPS processes EFT transactions on behalf of government agencies for a number of purposes including payment of fines, fees and cash bail deposits. It conducts business in more than 40 states with more than 1,400 government agencies, including several sheriffs departments in California counties.

9

Legislature created this alternative in order to "make it easier for people to pay fines, post bail, and to alleviate time spent in jail."

The record also shows that GPS is not the only company that provides EFT services to California counties that operate section 6159 cash bail payment systems. For example, EZ Card and Kiosk provides these same services in Madera and Orange Counties and, like GPS, it is not a licensed bail agent. Thus, even if GPS were enjoined from providing its services in California, Aladdin's customer base would still have the option of making a cash bail payment with a credit or debit card or other EFT mechanism.

When a UCL action is based on an unlawful business practice, "there must be a causal connection between the harm suffered and the unlawful business activity. That causal connection is broken when a complaining party would suffer the same harm whether or not a defendant complied with the law." (*Daro*, *supra*, 151 Cal.App.4th at p. 1099.) Here, GPS's evidence established a lack of causation by showing that any diversion of potential customers from Aladdin to GPS results from the Legislature's establishment of the cash bail payment system as an alternative to the traditional bail bond service, and not from the fact that GPS conducts its business without a bail agent license.

Aladdin contends that the issue of causation cannot properly be decided on summary judgment. However, in making this assertion, it relies on cases addressing a different issue, the causation element of a negligence claim. In that context, the elements of breach of duty and causation are often questions of fact for the jury to decide. (See, e.g., *Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1139.) However, even in that context summary judgment is appropriate when causation is a question of law. (*Ibid.*) Here, Aladdin's lack of standing was established as a matter of law because GPS's evidence broke the alleged causal connection between Aladdin's reduced customer base and GPS's challenged business activities. That evidence clearly established that Aladdin lost customers because the

10

Legislature enacted Government Code section 6159 and that it would suffer that loss whether or not GPS obtained a bail bond license.

Alternatively, Aladdin contends that even if causation "is capable of summary resolution," GPS failed to carry its burden of showing that it did not injure Aladdin because there are factual disputes about whether GPS engaged in the activities that Aladdin characterizes as unlawful. This argument rests on a misunderstanding of UCL standing which fails to distinguish this independent requirement from the elements of the claim itself. In order to pursue a UCL claim, the plaintiff must show that the practices that it characterizes as unlawful caused it to suffer an actual economic injury. (*Kwikset*, *supra*, 51 Cal.4th at pp. 321-322.) The summary judgment evidence GPS produced shows that Aladdin cannot satisfy that requirement.

Aladdin contends that even if GPS met its initial evidentiary burden, Aladdin's evidence creates a "material factual dispute on the issues of causation and standing." According to Aladdin, it produced evidence which proves that GPS is not just a card processor, but also provides other services which facilitate the completion of cash bail transactions. From Aladdin's perspective, this evidence establishes two relevant facts: (1) GPS's business model requires that it "undertake all of the regulated functions of a traditional bail agent in order to actually complete cash bail transactions," and (2) If GPS did not perform these "regulated bail agent activities," consumers would not use the cash bail option, but would instead engage the services of a bail bond agent like Aladdin.

We disagree with this argument for several independent reasons. First, the record citation Aladdin provides for its "evidence" simply refers to several pages in a statement of "undisputed material facts and supporting evidence" that Aladdin filed in opposition to the summary judgment motion, and not to any underlying evidence. Many of those statements are argumentative, conclusory and expressly disputed by GPS. Second, Aladdin's contention on appeal that GPS "completes cash bail transactions" is not supported by the evidence we have found in the record going

11

beyond Aladdin's "statement of undisputed material facts." This evidence appears to relate only to GPS's business activities outside California that are not material to this dispute. Third, Aladdin's observation that GPS's services would be regulated by the Insurance Code if it were a bail bond agent does not constitute evidence that GPS is actually a bail bond agent.

In sum, evidence that GPS provides support services to cash bail payment programs operating under Government Code section 6159 does not alter our conclusion that Aladdin's shrinking customer base does not establish UCL standing. As the superior court found, economic injury resulting from the loss of customers who use a credit card, debit card or other EFT to pay cash bail results from the existence of the statutory system authorized by section 6159, not from the fact that GPS does not have a bail bond license.

### 2. Investigation Costs

Alternatively, Aladdin contends it has standing because it suffered an economic injury by incurring "significant costs and expenses" to investigate the "nature, scope and extent of Defendant's conduct." To support this contention, Aladdin relies on the declaration of Justin Pinney, its associate general counsel and director of corporate compliance. Pinney confirmed that Aladdin used employees and paid outside vendors to investigate GPS's conduct. He stated that Aladdin paid money to hire outside counsel, obtain copies of GPS's contracts, and to determine which California counties were involved with GPS's allegedly unlawful activities. Pinney also stated that Aladdin incurred expenses by diverting staff to investigate GPS's activities. In this regard, Pinney estimated that he personally spent between 6 and 15 hours "conducting pre[-]litigation activities."

These "pre-litigation" costs do not establish standing to bring a UCL claim because they are not an economic injury caused by the business practices that Aladdin characterizes as unlawful. Rather, as Pinney's declaration confirms, the reason Aladdin incurred pre-litigation expenses was to generate evidence. Aladdin then used

12

that evidence to support this lawsuit. "Plaintiffs cannot establish standing to pursue a UCL claim based on expenses incurred in order to bring their UCL claim. If they could, the requirement that individuals show they lost money or property 'as a result' of the challenged practice in order to have standing to sue under the UCL would be meaningless. [Citation.]" (*Robinson v. HSBC Bank USA* (N.D. Cal. 2010) 732 F.Supp.2d 976, 989.)

Aladdin mistakenly relies on *Havens Realty Corp v. Coleman* (1982) 455 U.S. 363 (*Havens*). *Havens* was a federal action against a realty company for racial steering in violation of the Fair Housing Act. One issue before the high court was whether a nonprofit community organization plaintiff—Housing Opportunities Made Equal (HOME)—had standing to bring the action. (*Id*. at pp. 367, 379.) In its complaint, HOME alleged that it had " 'been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services,' " and that it " 'has had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices.' " (*Id.* at p. 379.) The *Havens* court found these allegations were sufficient to withstand a motion to dismiss for lack of standing. (*Ibid*.) The court reasoned that if the defendants' steering practices "have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests . . . ." (*Ibid*., fn. omitted.)

Relying on *Havens*, Aladdin attempts to characterize its pre-litigation costs as "*Havens* expenses." But, unlike this case, the *Havens* plaintiff alleged that it could not continue to provide its services to the public without expending resources to " 'counteract' " the defendants' unlawful activity. (*Havens*, *supra*, 455 U.S. at p. 379.) This allegation was sufficient to establish standing because proving it would

13

show that the allegedly illegal conduct impacted HOME's operating budget, causing it an actual economic injury. Here, proof that Aladdin spent money to investigate GPS's activities would not show that those allegedly unfair business activities had any independent economic impact on Aladdin's bail bond business. Beyond that, *Havens* does not hold or intimate that a party can manufacture an economic injury by incurring investigation costs to generate evidence for its lawsuit.

Aladdin also relies on *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798 (*Buckland*), overruled on another ground in *Kwikset*, *supra*, 51 Cal.4th at page 337. There, an individual and her organization brought an action to prevent defendants from marketing their skin lotions and creams. The claims of the individual plaintiff were dismissed pursuant to a demurrer. One issue on appeal was whether Aladdin had standing to bring a UCL claim when the "only loss of money or property she identified was her expenditures of funds to buy respondents' allegedly defective products . . . ." (*Buckland*, at p. 813.)

Because the injury in fact standing requirement is rooted in the federal constitution, the *Buckland* court consulted federal authority. (*Buckland*, *supra*, 155 Cal.App.4th at pp. 815-816.) It found that the circuit courts were divided "over whether the costs an organization incurs to pursue litigation are sufficient, in themselves, to establish injury in fact." (*Id*. at p. 815.) According to the *Buckland* court, the majority view is that " '[a]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit,' " but "funds expended independently of the litigation to investigate or combat the defendant's misconduct may establish an injury in fact. [Citations.]" (*Ibid*.) The *Buckland* court adopted this rule and applied it to the individual plaintiff in that case. Ultimately, the court held that the plaintiff had not suffered an injury in fact because she purchased the defendant's product for the purpose of establishing standing and she could not identify any expenditure she made independently of the litigation. (*Id*. at p. 816.)

14

Relying on *Buckland*, Aladdin contends that it has standing because it incurred expenses independently of this litigation to investigate and combat GPS's allegedly unlawful activity. However, this contention is not supported by Pinney's declaration, the only evidence that Aladdin references. Indeed, Pinney expressly conceded that Aladdin's investigation constituted "pre[-]litigation activities."

Ignoring this fact, Aladdin insists that, "[w]ell before any litigation was considered," it expended significant time and resources investigating and documenting GPS's activities in order to assist government regulators and convince them to uniformly enforce the law. We find no evidence in Pinney's declaration or anywhere else that Aladdin's investigation was conducted independently of this lawsuit. While the record shows that Aladdin shared its evidence with the Department, it did so as part of this litigation in order to support its petition for a writ of mandate. Thus, Aladdin has failed to identify any evidence supporting its remarkable claim that it investigated GPS's activities for non-litigation reasons.

For all of these reasons, we conclude that the trial court did not err in granting summary judgment on the ground that Aladdin lacked standing to bring the remaining claims asserted in the SAC that were not dismissed on demurrer.

## C. GPS's Business Practices Were Not Unlawful or Unfair Under the UCL

As noted in our factual statement, the superior court granted summary judgment not only because Aladdin lacked standing but also because the evidence established that GPS's business activities are not unlawful and unfair as required for a claim brought under the UCL. We agree with the trial court that the summary judgment evidence establishes Aladdin cannot prove its UCL claim based on the theory of liability alleged in the SAC.

"The UCL's unlawful prong ' " 'borrows' violations of other laws and treats them as unlawful practices" that the unfair competition law makes independently actionable. [Citation.]' [Citation.]" (*Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 520.) Furthermore, even if a business practice is not unlawful,

15

it may violate the UCL if it is deemed "unfair" as that term has been defined by the pertinent case law. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co*. (1999) 20 Cal.4th 163.) Here, Aladdin's theory of liability is that GPS's business practices violate the license and regulatory requirements imposed on bail bond agents by Insurance Code section 1800 et seq., and are not authorized by Government Code section 6159.[4] As we will explain, this theory is legally flawed and unsupported by factual evidence.

### 1. *The Insurance Code Provisions*

Section 1800, subdivision (a) (section 1800(a)) states: "An insurer shall not execute an undertaking of bail except by and through a person holding a bail license issued as provided in this chapter. A person shall not in this state solicit or negotiate in respect to execution or delivery of an undertaking of bail or bail bond by an insurer, or execute or deliver such an undertaking of bail or bail bond unless licensed as provided in this chapter, but if so licensed, such person may so solicit, negotiate, and effect such undertakings or bail bonds without holding or being named in any license specified in Chapter 5 of this part."

There does not appear to be any case authority construing the scope of the licensing requirement imposed by section 1800(a). However, the plain language of this statute imposes the requirement on persons who solicit, negotiate or arrange for the execution of an "undertaking of bail or a bail bond by an insurer."

A bail bond is defined in section 1800.4 as "any contract not executed by a surety insurer for or method of release of person arrested or confined on account of any actual or alleged violation of the provisions of any law of this or any other State or of any municipality in the State of California, including any release by means of cash or other property deposited in lieu of bail under the provisions of sections 1295

---

[4] During the remainder of our analysis, statutory references to section 1800 and its subdivisions refer to the Insurance Code. Statutory references to section 6159 refer to the Government Code.

and 1298 of the Penal Code whereby the attendance in court when required by law and obedience to orders and judgment of any court by the person released is guaranteed." An undertaking of bail is similar to a bail bond except that "[a]n 'undertaking' is executed by sureties only, while a 'bond must be executed by both the principal and sureties.' [Citation.]" (*Associates Capital Services Corp. v. Security Pac. Nat. Bank* (1979) 91 Cal.App.3d 819, 823-824.)

The evidence below shows that GPS does not provide services related to the posting of an undertaking of bail or a bail bond by an insurer. Unlike Aladdin, GPS is not a bail bond agent for an insurance company. Instead, GPS processes credit and debit card payments of cash bail that are made to government agencies pursuant to section 6159. Aladdin failed to produce evidence which materially disputes this fact. Thus, the summary judgment evidence establishes that GPS does not provide any services in California which require a bail bond license.

Aladdin's contrary arguments are based on an erroneous interpretation of section 1800(a). Aladdin appears to concede that the first sentence of this statute pertains only to persons acting as insurers. However, it contends that the second sentence broadly applies to third parties by prohibiting "unlicensed persons from advertising, negotiating, or participating in a bail transaction for compensation where the bail contract is issued by someone else." Thus, according to Aladdin, GPS violates this provision because it participates in bail transactions and charges a fee for card processing services.

We disagree. By its express terms, section 1800(a) is limited to insurers and to individuals who solicit, negotiate, or arrange for the posting of an undertaking of bail

or a bail bond by an insurer.[5]  It does not purport to regulate third parties who provide card processing services to counties operating a cash bail payment program established under section 6159.

Aladdin goes on to argue that section 1800, subdivision (b) (section 1800(b)) supports its contention that section 1800(a) broadly applies to all bail related commercial activity whether or not that activity is conducted by or on behalf of an insurer.  Section 1800(b) states:  "For purposes of this section, 'solicit' shall include any written or printed presentation or advertising made by mail or other publication, or any oral presentation or advertising by means of telephone, radio, or television which implies that an individual is licensed under this chapter, and any activity in arranging for bail which results in remuneration to the individual conducting that activity."

Aladdin's theory is that GPS solicits bail under section 1800(a) because its activities are covered by the broad statutory language in section 1800(b) which defines "solicit" as "any activity in arranging for bail which results in remuneration to the individual conducting that activity."  However this broad definition must be viewed within the scope of subdivision (a), which expressly limits the license requirement to those who "solicit . . . in respect to execution or delivery of an undertaking of bail or bail bond by an insurer . . . ."

Aladdin also argues that limiting the reach of the section 1800(a) license requirement to bail activities conducted by or on behalf of an insurer is inconsistent with the broad statutory definition of a "bail bond," which includes "any contract not

---

**5**  Aladdin advocates for a broad construction of the statutory term "by an insurer" which would include any person who promises to indemnify another person by assuming a contractual obligation to pay if a certain event occurs.  Even under Aladdin's broad definition, we find no evidence in this record that GPS is an insurer or the agent of an insurer.  Indeed undisputed evidence incorporated into the SAC shows that GPS provides EFT services to government agencies who operate cash bail payment systems authorized by section 6159.

executed by a surety insurer," and any "method of release," including the payment of cash bail. However, as the trial court emphasized in its summary judgment ruling, a bail bond is not "any" contract or method of release, but a specific type of contract or method of release pursuant to which the attendance of the released person is "guaranteed." (§ 1800.4.)

GPS submitted evidence regarding the nature and scope of its services through the declaration of its president and chief operating officer, Mark MacKenzie. For a fee, GPS contacts a cardholder's issuing bank on behalf of the government agency to verify that the debit or credit cardholder possesses sufficient funds or credit with its card company to pay the charge. If funds are available, and payment is authorized, GPS forwards the authorization to the participating agency. The card issuing bank then captures the funds from the cardholder's account and transmits the payment to a "gateway" organization affiliated with GPS. That affiliate then wires the funds to a GPS account from where they are paid out to the participating agency, usually pursuant to an automated deposit system but sometimes by payment of a check. According to MacKenzie the settlement of the funds into the agency's account occurs within 48 hours after authorization from the cardholder's bank. GPS does not play any role in the exoneration or forfeiture of a cash bail payment. If any part of the payment is returned to the cardholder, that payment is made directly by the Agency to the cardholder who posted the cash bail.

Aladdin concedes that GPS has no involvement in the procedures governing the exoneration and forfeiture of bail. (See Pen. Code, § 1300.) Nevertheless, it argues that GPS guarantees the appearance of the released detainee because that person is released after GPS obtains authorization for the card charge, but before the payment is actually transmitted to the Agency. Thus, Aladdin's theory is that GPS acts as a guarantor of the bail payment during that interim period of up to 48 hours because in at least one of the contracts that Aladdin produced, GPS assumed contractual responsibility for handling card charge "reversals" or "chargebacks."

19

As explained above, a bail bond is a contract or method of release pursuant to which the released person's appearance in court is guaranteed. (§ 1800.4.) Even if we could be persuaded to characterize a contractual assumption of responsibility for a credit card chargeback as a "guarantee," that provision is part of an administrative services contract between GPS and a government agency pursuant to which the chargeback risk is allocated to GPS. It is not evidence that GPS has ever posted cash bail as a guarantee that the released person would subsequently appear in court.

GPS produced evidence that it handles a card holder's funds solely for administrative purposes, that the funds are always the property of the cardholder, and that it is "only acting to provide remote payment service for the benefit of [the] payee (debit/credit cardholder)." Aladdin failed to produce any evidence to the contrary. Thus, the record shows that GPS is not a guarantor within the meaning of section 1800.4.

Alternatively, Aladdin argues that even if GPS is not a guarantor, it participates in the execution of a bail bond because the cardholder's payment itself constitutes a "guarantee" that brings the transaction within the definition of a bail bond. However, under this version of Aladdin's theory, the parties to the alleged bail bond transaction are the cardholder and the government. GPS would not need a license to process the cardholder's payment on behalf of the government because it would not be soliciting, negotiating or executing a bail bond by an insurer. (§ 1800(a).)

Changing course, Aladdin argues that even if section 1800(a) does not require that GPS obtain a bail agent license, GPS's business activities are covered by section 1800.75, which states: "No person shall advertise or hold himself out as engaging in the business of executing, delivering, or furnishing bail bonds or undertakings of bail whether or not for consideration without holding at the time thereof all proper licenses required by this chapter." Aladdin contends that section 1800.75 imposes an "independent" licensing requirement which casts a broader net than section 1800(a)

20

because it does not contain the qualifying phrase "by an insurer" which appears in section 1800(a), but instead applies to anyone who advertises for bail.

Section 1800.75 does not impose an "independent" license requirement, but expressly incorporates license requirements imposed by other provisions of "this chapter." Section 1800(a), the only statute on which Aladdin relies that does impose a license requirement, applies only to persons who provide services related to an undertaking of bail or the posting of a bail bond by an insurer. As explained above, GPS is not a bail bond agent and does not need a bail bond license because it does not provide services relating to the posting of an undertaking of bail or a bail bond by an insurer.

### 2. Government Code Section 6159

As discussed above, section 6159 establishes a method for arrested or detained people to secure temporary release without having to engage the services of a bail bond agent by authorizing counties to accept debit and credit card payments and EFTs for the payment of cash bail for a non-felony offense. (§ 6159, subd. (b)(1).)

Section 6159 defines an EFT as "any method by which a person permits electronic access to, and transfer of, money held in an account by that person." (§ 6159, subd. (a)(6).) Counties that operate section 6159 cash bail payment systems are expressly authorized to execute contracts with third-party EFT processors, and to allow those service providers to charge a fee for the cost of the transaction. (§ 6159, subds. (b)(1), (d).) Section 6159 does not require that a third-party EFT service provider have a bail bond license.

We have already summarized the evidence GPS produced to establish that it provides EFT services to California counties pursuant to section 6159. This evidence also shows that GPS's third-party service contracts with California counties are not unlawful because they are expressly authorized by section 6159.

Aladdin contends that section 6159 does not "excuse" EFT processors from their "obligations to comply with any other laws that their conduct triggers, including

21

the bail statutes and regulations." That may be true, but Aladdin misconstrues the relevant inquiry. The question presented by this appeal is whether GPS must possess a bail bond agent license in order to provide EFT processing services to county agencies in this state. As explained above, section 1800(a) imposes that license requirement on specific categories of people, which does not include EFT processors. Beyond that, section 6159 expressly authorizes counties to establish cash bail programs, to employ service providers like GPS who do not have a bail bond license, and to allow those third-party service providers to charge a fee for their services. Thus, the two statutes are consistent and, when construed together, they reinforce our conclusion that GPS's business activities do not require a bail bond license.

Aladdin next argues that it produced evidence which creates a material factual dispute as to whether GPS is really an EFT processor. Aladdin asserts this evidence shows that GPS does not "operate" under section 6159 because it "writes felony bail," while section 6159 is limited to non-felony charges. Aladdin's evidence consists of computer docket records from a handful of Sonoma County felony cases which it has cross-referenced against a report of EFT transactions that GPS processed in California between 2005 and 2011. At best, this evidence shows that GPS processed EFT charges that were accepted by Sonoma County as payment of cash bail in felony cases. But, it does not support Aladdin's very different contention that GPS "writes felony bail." Aladdin has conceded that GPS does not post its own money for detained individuals and plays no role in the exoneration or forfeiture of bail. Beyond that, the evidence shows that GPS does not guarantee that the individual who is released after the cardholder posts cash bail will subsequently appear in court. Thus, GPS does not "write" felony bail.

Furthermore, Aladdin's contention that GPS does not "operate" under section 6159 rests on the erroneous legal premise that the statute requires third-party service providers to reject card payments made to pay cash bail in felony cases. Section 6159 authorizes counties to accept EFT payments of cash bail in non-felony cases but does

not impose any obligation on the EFT processor to ensure that the payments are used only in non-felony cases.[6] Elsewhere in its appellate brief, Aladdin contends that the fact that section 6159 does not regulate GPS's business activities actually helps prove its "point," which is that GPS's activities are regulated by section 1800. We disagree. As we have already explained, section 1800 does not apply to GPS's business because it does not solicit, arrange or post undertakings of bail or bail bonds by an insurer.

Aladdin also asserts it produced evidence that GPS's business includes a panoply of bail-related services other than processing EFT payments, and that GPS has touted these services in other litigation in which it has been involved. Aladdin contends that this evidence create a material factual dispute as to whether the services GPS provides through its contracts with several county sheriffs in this state are unfair and unlawful because GPS does not comply with section 1800 et seq. While there appears to be no dispute that GPS provides counties with support services in addition to processing card payments of cash bail, this evidence does not create a material factual dispute precluding summary judgment because these ancillary services do not involve the solicitation, negotiation, or execution of an undertaking of bail or bail bond by an insurer which would bring them under the terms of section 1800 et seq.

### 3. Insurance Regulations

In its SAC, Aladdin alleged on information and belief that GPS's business activities violate several insurance regulations set forth in Title 10 of the California Code of Regulations (10 CCR). Aladdin contends these insurance regulations are independent predicate laws supporting its UCL claim against GPS.

---

[6] For this reason, Sonoma County has a policy that arrested or detained people are permitted to post cash bail only after the Sheriff's office confirms they have "been arrested on misdemeanor charges" and "are eligible to post bail by this method." To the extent Aladdin believes that Sonoma or some other California county is violating the provision of section 6159 limiting the payment of cash bail to non-felony cases, it has sought legal redress against the wrong entity.

As examples, Aladdin invokes regulations which prohibit a "bail licensee" from giving gifts to public officials (10 CCR § 2078); soliciting detained persons for bail (10 CCR § 2074); and charging excessive and/or impermissible fees for its services (10 CCR §§ 2081-2082). The term "bail licensee" is defined by the regulations as one who holds a license specified in section 1801 of the Insurance Code. (10 CCR § 2054.1.) Since the evidence establishes that GPS does not hold or need to hold a bail agent license, Aladdin's reliance on these regulations does not give rise to a material factual dispute.[7]

## IV.

## THE DEMURRER RULING

### A. Standard of Review

"A demurrer tests the sufficiency of the plaintiff's complaint, i.e., whether it states facts sufficient to constitute a cause of action upon which relief may be based. [Citations.] In determining whether the complaint states facts sufficient to constitute a cause of action, the trial court may consider all material facts pleaded in the complaint and those arising by reasonable implication therefrom; it may not consider contentions, deductions or conclusions of fact or law. [Citations.] The trial court also may consider matters of which it may take judicial notice. [Citations.] A demurrer should not be sustained without leave to amend if the complaint, liberally construed, can state a cause of action under any theory or if there is a reasonable possibility the defect can be cured by amendment. [Citations.]" (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 220.)

Two separate standards of review potentially apply to an appeal from a judgment sustaining a demurrer. (*G. L. Mezzetta, Inc. v. City of American Canyon* (2000) 78 Cal.App.4th 1087, 1091.) " '. . . First, the complaint is reviewed de novo to

---

[7] GPS contends that it produced evidence that it does not, in any event, engage in the activities addressed by these regulations. Aladdin does not dispute or even address this contention in its reply brief.

determine whether it contains sufficient facts to state a cause of action. [Citation.] In doing so, we accept as true the properly pleaded material factual allegations of the complaint, together with facts that may be properly judicially noticed. Reversible error exists only if facts were alleged showing entitlement to relief under any possible legal theory. [Citations.] [¶] Second, where the demurrer is sustained without leave to amend, reviewing courts determine whether the trial court abused its discretion in doing so. [Citations.] On review of the trial court's refusal to grant leave to amend, we will only reverse for abuse of discretion if we determine there is a reasonable possibility the pleading can be cured by amendment. Otherwise, the trial court's decision will be affirmed for lack of abuse. [Citations.]' " (*Id.* at pp. 1091-1092; see also *Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497-1498.)

In this case, Aladdin did not request leave to amend its second cause of action in the trial court and it does not seek that opportunity here either. Rather, Aladdin steadfastly maintains that the SAC states a cause of action for false advertising under the Lanham Act. Thus, we independently review the SAC to determine if Aladdin alleged facts sufficient to support its false advertising claim.

**B. Aladdin Did not Allege A Cause of Action Under The Lanham Act**

Section 43 of the Lanham Act "authorizes suit against persons who make false and deceptive statements in a commercial advertisement about their own or the plaintiff's product. [Citations.]" (*Jarrow Formulas, Inc. v. Nutrition Now, Inc.* (9th Cir. 2002) 304 F.3d 829, 835.) "A prima facie case requires a showing that (1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in a commercial advertisement or promotion; (3) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (4) the deception is material, in that it is likely to influence the purchasing decision; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by

25

direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product. [Citations.]" (*Id*. at p. 835, fn. 4.)

Here, the SAC does not state facts which if proven would satisfy the first element of a false advertising claim because it does not identify an allegedly false statement that appeared in the defendant's commercial advertisement or promotion. Instead, the theory alleged in the SAC is that GPS's advertising violates the Lanham Act because it is conceptually misleading. By using words like "gov" and "government," and a capitol dome as its logo, GPS allegedly misleads consumers to believe that it is affiliated with or endorsed by the government. In other words, Aladdin's theory is that even though GPS did not make a provably false statement, its advertising is nevertheless unlawful because it misleads consumers to believe that it is a government agency or affiliate.

A Lanham Act claim can be based on a theory of "false association," i.e., that the defendants made "false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device . . . . [Citations.]" (*Waits v. Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093, 1108.) However, to have standing to bring such a claim, the plaintiff must possess a commercial interest in the misused mark, name or device or in the good or service that is allegedly being misrepresented. (*Id*. at pp. 1109-1110 [and authority cited there].) In this case, even if Aladdin had requested leave to amend its pleading, we cannot conceive of facts it could allege in order to establish that it suffered this type of commercial injury.

Aladdin contends the Lanham Act "prohibits misleading advertisements, not those containing direct false factual assertions, and it specifically prohibits misleading statements that the competitor is associated with, endorsed by, or approved by another, including the government." This argument conflates two distinct theories for alleging a claim under the Lanham Act. As explained above, a claim may be based on a false statement of fact, or it can be based on an advertisement which uses a distinct

name or mark to create a false association. Here, the SAC does not identify a false statement in a GPS advertisement. Nor does that pleading allege facts which, if proven, would give Aladdin a commercial interest in the distinctive names or marks that the defendant allegedly used to create a false association with the government.

Aladdin mistakenly relies on *Trafficschool.com, Inc. v. Edriver, Inc.* (C.D. Cal. 2008) 633 F.Supp.2d 1063 (*Edriver*).[8] In that case, an internet provider of consumer referrals to traffic schools and driver's education classes was found liable for false advertising under the Lanham Act. The plaintiff had alleged that the defendant's website, DMV.ORG, contained several false statements. After a court trial, the district court concluded that although none of the challenged statements were "literally false," the evidence showed that one or more of them was "literally true but likely to mislead or confuse consumers" to believe that the defendant's website was owned by or affiliated with the government. (*Id*. at pp. 1074, 1075-1080.)

Aladdin contends that *Edriver* illustrates that "[m]isleading consumers into believing a private company is actually a government agency is a sufficient basis on which to allege a Lanham Act false advertising claim." However, *Edriver* was not a pleading case; it did not address or even consider what allegations are sufficient to allege a false advertising claim. Furthermore, Aladdin overlooks that *EDriver* expressly confirms that the first element of false advertising under the Lanham Act is "a false statement of fact." (*Edriver*, *supra*, 633 F.Supp.2d at p. 1074.)

*Edriver* does support the proposition that a false statement can either be literally false or literally true but materially misleading. (*Edriver*, *supra*, 633 F.Supp.2d at p. 1074.) The *Edriver* court found that although the defendant's statements were literally true, they constituted false advertising because they actually misled consumers to believe that defendant's website was an official government

---

[8] *Edriver* was reversed in part on a ground not relevant to this appeal. (*TrafficSchool.com, Inc. v. Edriver, Inc.* (9th Cir. 2011) 653 F.3d 820.)

27

website.  But this ruling does not help Aladdin because its SAC does not identify any actual statement in a GPS advertisement that allegedly misled or deceived consumers. As reflected in our factual summary, the SAC allegations identified words rather than statements; Aladdin alleged that the use of the words "gov" and "government" was misleading.  But it did not allege that these isolated words were used in a statement of fact that was provably false or misleading.

Aladdin argues that its pleading allegation that GPS's advertising is misleading is sufficient for purposes of a demurrer because that allegation must be accepted as true.  (Citing *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912, 925-926.)  The correct rule is that " 'we assume the truth of all properly pleaded facts' " and those that can be implied or inferred from the facts that were expressly alleged.  (*Id*. at p. 925.)  The bare allegation that GPS's advertising is misleading is not a properly pleaded fact; it is a legal conclusion which may not be considered when ruling on a demurrer.  (*Young v. Gannon*, *supra*, 97 Cal.App.4th at p. 220.)

For all these reasons, we conclude the demurrer to the second cause of action was properly sustained.

## IV.

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to GPS.

_____

RUVOLO, P. J.


We concur:


_____

REARDON, J.


_____

RIVERA, J.

Trial Court: Sonoma County Superior Court

Trial Judge: Hon. Elliot Daum

Counsel for Appellant: Robert W. Hicks & Associates and Robert W. Hicks, Kenneth R. Wright

Counsel for Respondent: Dillon & Gerardi and Scott Alan Miller

Abbey, Weitzenberg, Warren & Emery and Mitchell B. Greensberg