Filed 10/11/23  Ellorin v. O'Rear CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| BEN B. ELLORIN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CHARLES O'REAR et al.,<br><br>    Defendants and Respondents. | D081135<br><br><br>(Super. Ct. No. 37-2021-00053188-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed in part; reversed and remanded in part.

Ben B. Ellorin, in pro. per., for Plaintiff and Appellant.

Horton, Oberrecht & Martha, Erin E. Schroeder and Andrew B. Dorr for Defendant and Respondent Charles O'Rear.

Davis Wright Tremaine, Spencer Persson and Andrew Row for Defendant and Respondent Microsoft Corporation.

Ben B. Ellorin appeals from a judgment of dismissal resulting from an order sustaining a demurrer without leave to amend.  The trial court's basis for sustaining the demurrer was its conclusion that the complaint was time-barred and that neither the delayed discovery rule nor any amendment could

cure this defect.  Ellorin contends the trial court erred, not only in sustaining the demurrer, but also in failing to consider pertinent evidence, in denying him leave to file a brief in response to the court's tentative ruling, and in entering judgment not only for the defendant—Charles O'Rear—who had filed the demurrer, but also for O'Rear's two co-defendants:  Microsoft Corporation (Microsoft) and William Henry Gates III.  For reasons discussed *post*, we agree with the trial court's conclusion that the complaint was time-barred as to O'Rear and that neither the delayed discovery rule nor any amendment could cure this defect.  Hence we affirm the judgment as to O'Rear.  As to Microsoft and Gates, we reverse the judgment and remand the case for further proceedings consistent with this opinion.

## I.  Allegations in the Complaint

Because this appeal is from a judgment based on an order sustaining a demurrer, we proceed as though all allegations of material fact pleaded in the complaint have been admitted by the defendants.  (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; *Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 160, fn. 4; *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2015) 237 Cal.App.4th 23, 26; *Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604 [in considering merits of a demurrer, "the facts alleged in the pleading are deemed to be true, however improbable they may be"].)

2

Proceeding on this basis, we accept as true for purposes of this appeal the following factual allegations set forth in the complaint.[1]

## A.    Ellorin, the Ranch that He—or He and His Wife Veronica—Used to Own, and the Ranch's Wild Turkey Hill

Ellorin is a retired engineer who, from 1994 to 2003, owned—either alone or together with his now-deceased wife, Veronica—a rural property (the property or the ranch) located in in the town of Ramona in San Diego County.[2]  The property was named Rancho Ellorin Hacienda Farms, and Ellorin and Veronica derived much enjoyment from it.

> "We farmed, we raised animals, we enjoyed the vastness of the property, and were awed by its country atmosphere, beautiful oak[] trees, mature sycamore trees, streams, water falls, rock outcroppings, magnificent views and rolling hills."

These rolling hills included one hill in particular that featured "a 360 Degree view of the Ramona Valley as well as the best view of Mount Woodson, a

---

[1]    The complaint, filed by Ellorin proceeding in propria persona, consists of 42 pages comprising:  six template-type court forms (PLD-PI-001, PLD-PI-001(2), PLD-PI-001(3), PLD-PI-001 (6), CM-010, and MC-030) that the Judicial Council of California has promulgated and that Ellorin has filled in; four attachments on pleading paper (including five pages of what appears originally to have been a six-page document titled Plaintiff's Declaration) that Ellorin has incorporated by reference into the filled-in forms; and nine exhibits.

[2]    The complaint includes several discrepancies.  For example, it indicates in some places that Ellorin alone owned the property and in other places that Ellorin's wife Veronica was a co-owner with Ellorin.  As another example, the complaint indicates in some places that Ellorin (or Ellorin and Veronica) lost the property to foreclosure in 2003 and in other places that his (or their) ownership of the property terminated in 2002.

famous mountain only 2 Miles away." Ellorin dubbed this hill "Wild Turkey Hill."

## B. The Sequence of Alleged Events Placed at Issue in the Complaint

### 1. 1996-2002: Ellorin Battles Forces Threatening His Plans to Develop the Ranch, But Loses the Ranch to Foreclosure; He and His Family Experience Distress

During the latter part of the 1990s and continuing through and including at least 2002, Ellorin had "promising plans for the property" in general and for Wild Turkey Hill in particular. The "centerpiece" of these plans was to "construct[] a house at the top of [Wild Turkey Hill]." But Ellorin's plans foundered as a result of actions, taken by "radical [environmental] groups[,] the County[,] the Courts and the State," that prevented him from developing the property in the manner in which he desired to develop it. These actions were of sufficient concern to Ellorin that he "fought from 1996 through 2002 in and out of the Courts" to overcome them. "But [Ellorin's efforts were] to no avail." As a consequence of these circumstances, Ellorin and his family experienced "physical, emotional, and financial distress" during the 1996-2002 timeframe.

### 2. 2002-2018: Ellorin is Confronted with an Image of Wild Turkey Hill Whenever He Uses a Computer; He and Veronica Puzzle at the Riddle of the Image's Ubiquity, and They Experience Severe Distress

"[H]oping to save the ranch," Ellorin "travelled abroad [in 2002] to get some construction projects going." But this gambit failed, and Ellorin (or Ellorin and Veronica) ended up losing the ranch to foreclosure in 2003..

When Ellorin set out traveling abroad in 2002 in his efforts to save the ranch, he "went . . . with limited resources" and "without a personal computer." However, due to the ubiquity of "computer shops," he had ample

4

access to computers—and that is how "[t]he nightmare . . . beg[a]n." For, beginning close in time to the 2003 foreclosure and continuing for many years thereafter, Ellorin began finding that the monitor screen of "[e]very computer . . . [he] went to" featured a prominent image of a site that Ellorin "used to mow, clean[], and maintain[] from 1994 to around 2002" and atop which the foreclosure had prevented him from constructing a house: Wild Turkey Hill.

The ubiquity of one specific image on the screen of *every* computer Ellorin encountered is attributable to the fact that Microsoft had adopted that image as the "[d]efault [digital] [w]allpaper" for a new operating system, named Windows XP, that it launched in the early 2000's.[3] But what accounted for the existence of this *particular* image? And how had this image (the image) become the digital wallpaper of Microsoft XP?

Ellorin's reaction when he first saw the image was mixed.

> "[T]he first time . . . I saw the [image] . . . , I immediately recognized . . . Wild Turkey Hill. It brought me mixed feelings. I missed my family and my ranch and was happy to see it but surprised of how it got there."

Ellorin speculated regarding the provenance of the image. But, his speculation notwithstanding, Ellorin initially took no action.

> "I recalled . . . that several people . . . , including the realtor who [had] sold me the property, claimed that the ranch was included in the Registry of Film Making Venues. With this

---

[3] None of the defendants has admitted that the location depicted in the image is Wild Turkey Hill, and that among the exhibits to the complaint are printouts of Wikipedia entries stating that the image is of a different location altogether. Nonetheless, for the reasons noted at the beginning of Section I of this opinion, *ante,* we proceed as though the allegations of material fact that Ellorin has pleaded in the complaint have been admitted by the defendants.

5

in mind, I originally did not make the wallpaper sightings an issue."

Then, "[a]s time progressed . . . and the prospect of . . . [obtaining construction] projects [abroad] became dimmer . . . the thought of losing the ranch was imminent and troubled [Ellorin] considerably."

> "My property was foreclosed in 2003 via a Trustee's Sale. From that time on, viewing the [image of Wild Turkey Hill on the Microsoft XP] . . . wallpaper was so distress[ing] and seeing it over and over and over again every[] . . . time I went to a computer shop was torture and unbearable."

The toll that the image and its ubiquity took on Ellorin's wife, Veronica, was even greater than the toll it took on Ellorin.

> "[Veronica's] death was caused partly by experiencing emotional distress from 2001 through her death in 2012 by her exposure to the [image on the] Microsoft Windows XP Default Wallpaper . . . and her unanswered question why the picture of our distressed property was all over the Internet and was used as a Wallpaper by Microsoft without our knowledge and permission."

For 17 or 18 years—from 2001 or 2002 until the very last day of 2019—the provenance of the image and the manner in which the image had become the Windows XP default wallpaper, visible "all over the Internet," remained an enigma to Ellorin. However,

> "I was in a foreign country with limited resources and I relied on the thought that the [image] . . . was legitimate, and that there was nothing I could do to remove it. I did not have any reason to believe otherwise."

Thus, despite the distress that the image and its ubiquity were causing him, Ellorin took no action to investigate or to otherwise address the matter during this period of time.

### 3. 2019-2020: Ellorin Discovers the False and Fraudulent Narrative Attending the Image; and He Experiences Further Distress

On December 31, 2019, Ellorin, somewhat by happenstance, came across the explanation for the enigma of the ubiquitous image of Wild Turkey Hill.

> "[O]n December 31, 2019, after . . . [having] just returned from abroad after several years, [he] discovered the false and fraudulent narrative of the Microsoft Windows XP Default Wallpaper."

Specifically, while "trying to . . . replace the old image default wallpaper [on a] laptop computer," Ellorin happened upon accounts, published on the internet, indicating that the person who had captured the image was a photographer named Charles O'Rear; that O'Rear maintained that the year in which he had captured the image was 1996; that O'Rear had sold all rights in the image to Microsoft (reportedly in exchange for a "low six figure[]" sum); that Microsoft had named the image "Bliss"; and that "there had been considerable speculation" over time as to where the landscape depicted in the image was located, or if it was even real.

The accounts Ellorin encountered on the internet on December 31, 2019, also revealed what Ellorin refers to as "the false and fraudulent narrative of the Microsoft Windows XP Default Wallpaper" (the false narrative). That is, an explanation of the image's provenance in which O'Rear falsely asserts (among other things), not that the landscape depicted in the image is located in the town of Ramona, in San Diego County, but rather that it is located in *Sonoma* County and that it was while O'Rear was driving in Sonoma County en route to visit his girlfriend one day that he (O'Rear) spotted the landscape and captured the image on his camera.

In addition to encountering the false narrative, Ellorin also realized, as a result of O'Rear having claimed that the year in which he captured the image was 1996, that O'Rear must have gained access to the ranch, during the time that Ellorin or Ellorin and Veronica owned it (1992 to 2002 or 2003), without authorization.

> "During this time, people of all backgrounds . . . frequently visited my ranch. [M]ost of them . . . knocked on my door and obtained permission before roaming the property. They ha[d] the decency to obtain permission first. In the case of . . . O'Rear[,] however, it was different. He trespassed [o]nto my property beyond my first and second gates when he took them pictures and without my permission."

Further, the December 31, 2019, discovery also revealed to Ellorin that Microsoft was complicit.

> "Defendants publish[ed] an image with a false narrative across the Internet to be viewed by Billions of people worldwide. Microsoft was a major corporation. The organization was large and had all the resources. Microsoft should have been the 'adult' in the room with . . . O'Rear and . . . Gates . . . when they were making the deal [for the purchase and sale of the image]. Does anyone expect the Plaintiff to believe that Microsoft decided to publish the image as part of their major marketing program worldwide without vetting or making a background check of the 'Bliss' location? Where is the property? Who owns the property? What is the status of the property? How did you find this property? What were you doing on the property? Did you have the Owner's permission to enter the property? These are just [a] few of the questions Microsoft should have asked . . . O'Rear. These are common sense questions[,] and they reflect a fairly standard operating procedure during a vetting process. Plaintiff believes that Microsoft and . . . Gates . . . asked these questions to . . . O'Rear but purposely ignored [the answers to] them because they were overcome by greed [and other sentiments]. They thought that the Owners were naive, ignorant, and helpless."

8

In essence, the defendants "were remiss and irresponsible" and either "decided to ignore the process or ignore the results of a process of a normal due diligence that is a standard operating procedure for a project development of this large scale."

Ellorin's December 31, 2019, discovery of the false narrative sent him into a physical, emotional, and financial tailspin.

> "Said discovery triggered an old physical, emotional, and financial distress that now resulted in tremendous renewed emotional distress like nightmares, anxiety, anger, insomnia, bodily pains, mental problems and others. This renewed distress is mainly due to the nature and the way the false information was gathered, used, published, and covered up to the detrement [*sic*] of the Plaintiff and the Billions of people around the world who used the[] Windows XP Operating System."

This physical, emotional, and financial distress occasioned by the December 31, 2019, *discovery of the false narrative* was more intense than that which had been occasioned by mere *exposure to the image* prior to December 31, 2019.

> "Plaintiff and his old family[4] were subjected to distress for years when they were involuntarily subjected to viewing the 'Bliss' image. It was a distressful scenario then, but since the NEW discovery of the fraudulent narrative [o]n Dec. 31, 2019, it [has] become an unbearable nightmare for the Plaintiff and his new family as well. The emotional torture of continuously seeing the 'Bliss' while abroad was aggravated now considerably upon the discovery of the big lie that needs to be corrected."

---

4    Although the record is not altogether clear on this topic, it appears from the allegations in the complaint that, at some point during the period spanning the events alleged in the complaint, Ellorin (perhaps following a divorce from Veronica or perhaps following Veronica's death) remarried.

## II. Procedural History

### A.    The Complaint

On December 20, 2021, just shy of two years after having discovered the false narrative, Ellorin filed a complaint in the trial court. In the complaint, Ellorin pleaded the matters described in the preceding section. He also alleged "negligence" and an unspecified "intentional tort." In addition, he referred at least in passing to a variety of other types of actual or supposed theories of action, including negligent infliction of emotional distress, intentional infliction of emotional distress, fraud, mail fraud, "internet fraud," "unauthorized use of private property," unjust enrichment, and wrongful death.

In the complaint's prayer for relief, Ellorin requested several different remedies. These include (among other remedies): compensatory and punitive damages in the amount of $27 million, and an order requiring Microsoft to cease and desist from using the image as its Microsoft XP wallpaper. The relief sought also includes an order requiring all of the defendants "to publicly apologize to the Plaintiff and his old and new family and to all the Billions of Microsoft users around the world"; "to respond to the Millions of people who are still seeking and wondering where the real 'Bliss' hill is located, and to address their desire to save the 'Bliss' hill"; "to obtain the 25 Acre portion of the property where [Wild Turkey Hill] is located and . . . convey said site to the Plaintiff free and clear of any encumbrances, to be saved, preserved, and protected in honor of Plaintiff's Spouse who passed away wondering why the image was used and published without her permission."

## B.    The Demurrer

On March 21, 2022, O'Rear filed in the trial court and caused to be served on Ellorin a "Notice of Demurrer and Demurrer" (original notice) along with a brief and other supporting papers.  In the brief, O'Rear argued that the theories of action Ellorin had alleged in the complaint were time-barred and insufficiently pleaded.[5]  The hearing on O'Rear's demurrer (the demurrer) was set for July 15, 2022.

Thereafter, on June 17, 2022, O'Rear filed and caused to be served on Ellorin an "Amended Notice of Demurrer and Demurrer" (amended notice).  Included in the amended notice was essentially the same information that had been included in the original notice, along with several additional lines of text, describing the grounds for the demurrer, that were consistent with the arguments that had been set forth in the brief O'Rear had caused to be filed on March 21.  The brief, declaration, and exhibits that the amended notice identified as furnishing support for the demurrer were the *same* brief, declaration, and exhibits that the *original* notice had identified as furnishing support for the demurrer.

On July 6, 2022, Ellorin filed two briefs in which he argued against the demurrer.  The first of these two opposition briefs targeted what Ellorin refers to as the *original* demurrer, and the second opposition brief targeted

---

[5]    We note for the sake of completeness that, contemporaneously with the filing and service of his demurrer on March 21, 2022, O'Rear also filed and caused to be served a motion to strike certain passages of the complaint and a motion for an order requiring Ellorin to submit a $20,000 undertaking.  The trial court did not rule on either of these two motions.  Instead, both motions were taken off calendar at the time the court sustained the demurrer.  Inasmuch as neither of these two motions is a subject of this appeal, we do not address them further in this opinion.

11

what he refers to as the *amended* demurrer.[6]  To this second opposition brief, Ellorin appended a copy of the first opposition brief and (as exhibits) copies of responses by Ellorin to sets of special interrogatories, form interrogatories, and requests for production that O'Rear had propounded to him.  Neither of the two opposition briefs included a request for leave to amend.

On July 6, 2022 (the same day Ellorin filed his two briefs), O'Rear filed a reply brief.  Then, on July 14, 2022, the day before the hearing was scheduled to occur, the trial court posted a tentative ruling on the demurrer.[7]

---

[6]  The first opposition brief was titled "Plaintiff's Memorandum of Points and Authorities in Support of Overruling Defendant Charles O'Rear's Demurrer."  The second opposition brief was titled "Plaintiff's Memorandum of Points and Authorities in Support of Overruling Defendant Charles O'Rear's Amended Demurrer."  The word opposition does not appear in the title of either of these briefs; however, the substance of each of these briefs reveals that it is the functional equivalent of an opposition brief, and O'Rear (in reply) treated each of these briefs as such.  Ellorin's belief that there were two demurrers—one original, and the other amended—appears to derive from his having interpreted the word "amended" in the amended notice as having been intended to modify, not just "notice," but also "demurrer."

[7]  Ellorin argues "the Tentative Ruling was based on the original demurrer and not on the amended demurrer."  However, as noted *ante* and *post,* (1) O'Rear filed and served only one demurrer, (2) the brief, declaration, and exhibits that the amended notice of demurrer identified as furnishing support for O'Rear's demurrer were the *same* brief, declaration, and exhibits that the first notice of demurrer had identified as furnishing support for that demurrer, and (3) both sets of opposition papers that Ellorin had filed—the set he filed in opposition to what he understood to be O'Rear's "original demurrer" and the set he filed in opposition to what he understood to be O'Rear's "amended demurrer" (see *ante* text accompanying fn. 6)—were before the court.

12

## C.    The Tentative Ruling on the Demurrer

The tentative ruling revealed the trial court's provisional conclusion that the demurrer should be sustained without leave to amend.  It also revealed the basis for this provisional conclusion, which was a tentative determination by the trial court that Ellorin's claims were time barred, as the lawsuit had not been filed until "long after the applicable statute of limitations had run," and that "there is no reasonable possibility that the complaint [could] be amended to state a timely claim."  Nowhere in the tentative ruling was there any reference to the discovery responses that Ellorin had included as exhibits to his opposition briefs.

## D.    The Hearing on the Demurrer

The hearing on the demurrer went forward as scheduled on July 15, 2022,[8] the day after the tentative ruling had been posted.  Counsel for O'Rear

---

[8]    Ellorin states "[t]here was . . . no formal hearing on the [d]emurrer."  But this statement is at odds with his description (see *post*) of what transpired on July 15.  If and to the extent Ellorin intends this statement as an observation that participation in a hearing via telephone or video link is less traditional than participation in person, we note that he is correct in this regard—but that this observation is of no consequence inasmuch as the partially in-person and partially remote nature of a hearing in the trial court does not render the hearing any less official than it would be if conducted entirely in person.  (Cf. Cal. Rules of Court, rules 3.670(a) and 3.672(a).)  If and to the extent Ellorin intends this statement as an observation relating to the sequencing of the hearing on the demurrer and the proceedings on a case management conference that had been separately noticed for the same morning, we are unable to divine how the sequencing of these two proceedings, both scheduled for the same day, would have had any bearing on the substantive outcome of the demurrer.  Viewed in any light, Ellorin's rendition (see *post*) of the exchanges that occurred among himself, the court, and defense counsel during the July 15 proceedings reveals that a formal hearing on O'Rear's demurrer did indeed occur that day.

13

appeared in person and submitted on the tentative ruling.  Counsel for Microsoft appeared remotely via video link, and Ellorin appeared remotely via telephone or video link.[9]

No transcript exists of the July 15 proceedings.]  However, we understand from the rendition of events that Ellorin has set forth in his briefs on this appeal[10] that, during the proceedings that occurred on July 15, defense counsel argued "that the statute of limitations ha[d] expired and that the Appellant should have known sooner," and Ellorin "argued that the statute of limitations findings on the tentative ruling was erroneous and not based on facts" and that "the date of discovery and the date of filing were well within the statute of limitations."  But "[t]he Court dismissed [Ellorin's] points."

We further understand from Ellorin's rendition that, during the July 15 proceedings, Ellorin asked the trial court why the discovery responses he had appended as exhibits to the second of his two opposition briefs (see *ante*) had

[9]    O'Rear contends Ellorin appeared via video link, but the trial court's minute order confirming the tentative ruling as the order of the court indicates Ellorin appeared via telephone.

[10]    All descriptions of the July 15 proceedings that appear in the paragraph corresponding to this footnote, and all such descriptions that appear in the paragraph that follows, are drawn from the rendition of events set forth in Ellorin's briefs on appeal, rather than from the record. Recognizing that the defendants' recollections or characterizations of the proceedings might differ from Ellorin's (and even from one another's), and that no reporter's transcript of the proceedings is available for corroboration, we express no opinion as to the veracity or accuracy of any party's rendition.

14

not been filed and considered by the court.[11]  The court replied to this inquiry by saying that the discovery responses "were not of the Court's concern."  Perceiving that he needed more time to analyze the tentative ruling, and that he could not adequately address orally during the hearing what he considered to be the trial court's failure to grasp key temporal elements of the allegations in the complaint and the manner in which the discovery responses would elucidate those elements, Ellorin asked the court for leave to respond in writing to the tentative ruling.  The court denied this request.

Later the same day (July 15), the trial confirmed its tentative ruling as the order of the court.

### E.    Post-hearing Activity

Ellorin states that, notwithstanding the court's denial of leave to submit a written response to the tentative ruling, he "decided to write the brief anyway and submitted it to the Court on 07/16/2022 after [he] ha[d] properly reviewed the tentative ruling."  But (per Ellorin) the court neither considered nor acknowledged the brief.

On July 25, 2022, ten days after entry of the trial court's order sustaining O'Rear's demurrer, Microsoft filed and served on Ellorin a demurrer of its own (the Microsoft demurrer), along with a motion to quash service of the complaint for lack of personal jurisdiction.  However, on August 1, 2022, before the Microsoft demurrer and motion to quash could be heard, the trial court signed a judgment directing that the complaint be dismissed

---

[11]    Ellorin evidently was unaware that (see *ante*) the discovery responses he had appended as exhibits to the second of his two opposition briefs had been filed with that brief.  At least one of the defendants (Microsoft) likewise appears to be unaware that the discovery responses were filed.

15

with prejudice as to all three defendants, and the clerk entered the judgment. Thereafter Ellorin timely filed a notice of appeal from the judgment.

## III. Standard of Review

In reviewing a judgment predicated on an order sustaining a demurrer, we apply a de novo standard. That is, we exercise our independent judgment to ascertain whether the properly pleaded material factual allegations in the complaint, together with facts that may be judicially noticed, suffice to state a cause of action that could entitle the plaintiff to relief under any possible legal theory. (*Two Jinn, Inc. v. Gov't Payment Serv., Inc.* (2015) 233 Cal.App.4th 1321, 1344 (*Two Jinn*); *Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790.)

If the order includes a denial of leave to amend, then we also review the order, and the resulting judgment, for abuse of discretion. The plaintiff may establish an abuse of discretion by demonstrating that he could amend the complaint to state a cause of action warranting an award of relief. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349; *Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13.) If the plaintiff does not do so, then we will affirm for lack of abuse. (*Two Jinn, supra,* 233 Cal.App.4th at p. 1344, citing *G.L. Mezzetta, Inc. v. City of American Canyon* (2000) 78 Cal.App.4th 1087, 1091-1092 and *Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497-1498.)

## IV. Discussion

### A. The Statute of Limitations Defense

As the California Supreme Court has explained: " 'Statute of limitations' is the 'collective term . . . commonly applied to a great number of acts,' or parts of acts, that 'prescribe the periods beyond which' a plaintiff

may not bring a cause of action." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 395 (*Norgart*).) Among the purposes of a statute of limitations is "to protect defendants from the stale claims of dilatory plaintiffs" and "to stimulate plaintiffs to assert fresh claims against defendants in a diligent fashion." (*Ibid.*) The statute of limitations "operates in an action as an affirmative defense." (*Id.* at p. 396.)

"Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action." (*Norgart, supra,* 21 Cal.4th at p. 397; see also Code Civ. Proc., § 312.) Consequently, we must determine both the applicable limitations period(s) and the date of accrual for the cause of action pleaded in the complaint.

### 1.    The Applicable Limitations Periods

The defendants argue, and Ellorin does not dispute, that the limitations period set forth in Code of Civil Procedure section 335.1[12] applies to the legal theories pleaded in the complaint. This section, coupled with companion section 335, provides that an action for "injury to, or for the death of, an individual caused by the wrongful act or neglect of another" must be commenced within two years of such injury or death.

We agree this limitations period applies to at least one of the legal theories pleaded in the complaint; however, it is not the only limitations period that applies. In this regard, it is the law in California that an "appellate court[] reviewing a general demurrer [must] make a de novo determination of whether the complaint alleges 'facts sufficient to state a cause of action under *any possible legal theory,'*" including even "legal

---

[12]    All further statutory references are to the Code of Civil Procedure.

17

theories first raised by the reviewing court." (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1244-1245.)

As noted *ante,* the complaint includes reference to a variety of different legal theories. Several of these—for example, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and wrongful death—come within the two-year ambit of section 335.1. But others do not. By way of example, trespass upon real property, fraud, and unjust enrichment arising from mistake (as opposed to contract) generally are governed by the *three*-year statutes of limitations set forth in section 338. (See Code Civ. Proc., § 338, subd. (b) [trespass upon real property]; *id.,* subd. (d) [mistake]; and *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 348 [unjust enrichment arising from mistake].) For these reasons, we apply both the two-and three-year limitation periods to Ellorin's cause of action. Hence his cause of action ordinarily would have to have accrued no later than December 21, 2018—the date three years before the filing of the complaint—in order for the complaint, at least in part, to have been timely.

### 2.  The General Rule for Defining the Accrual of a Cause of Action, and the Delayed Discovery *Exception* to the General Rule

"The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' " (*Norgart, supra,* 21 Cal.4th at p. 397.) "In other words, it sets the date as the time when the cause of action is complete with all of its elements [citations]—the elements being generically referred to by sets of terms such as 'wrongdoing' or 'wrongful conduct,' 'cause' or 'causation,' and 'harm' or 'injury.' " (*Ibid.*)

18

However, there is an important exception to this general rule. That exception, known as the delayed discovery rule, or simply the discovery rule, "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Norgart, supra,* 21 Cal.4th at p. 397.) Explaining the operation of the discovery rule, our Supreme Court has stated that: "[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]. He has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements. [Citation.] He has reason to suspect when he has ' " ' " 'notice or information of circumstances to put a reasonable person on *inquiry*' " ' " ' [citation]; he need not know the 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place—he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does. (*Id.* at pp. 397-398, fn. omitted.)

"[U]nder the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 803 (*Fox*).) "[P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are

19

charged with knowledge of the information that would have been revealed by such an investigation." (*Id. a*t p. 808; see also *Nguyen v. Western Digital Corp.* (2014) 229 Cal.App.4th 1522, 1552 (2014).) The standard is an objective one. A court's inquiry is not "hypertechnical," but rather asks whether a plaintiff has reason "to at least suspect that a type of wrongdoing has injured them." (*Fox,* at p. 807.)

Citing the general rule and the delayed discovery rule, the defendants argue Ellorin's cause of action accrued in 2002 because Ellorin has made the following allegations in the complaint: that 2002 is the year in which he began suffering as a result of the image; that Ellorin knew immediately that this suffering (which he says, by 2003, had become unbearable torture) was attributable to the image; and that the further suffering he experienced later, after becoming aware of the false narrative, was merely a "renew[al]" of the distress he had experienced previously and/or of the aspects of such distress that had persisted unabated. Ellorin, by contrast, contends his cause of action did not accrue until December 31, 2019, because it was not until that date that he became aware of the false narrative and that he could not,

through reasonable diligence, have discovered the false narrative earlier.[13] As discussed *post,* we do not agree with either of these contentions.

We do not agree with *the defendants'* contention because, according to the allegations in the complaint, Ellorin did not suspect in 2002 or 2003 that anyone had done anything wrong to him. As noted *ante,* Ellorin alleges in the complaint that, at or about the time in 2002 that he was first exposed to the image, he recalled having been told by the realtor through whom he, or

---

[13]  The dominant theme of Ellorin's accrual argument is the discovery rule. However, also discernable in Ellorin's briefs is a muted suggestion that the defendants' conduct has resulted in the existence of two independent causes of action: one rooted in the defendants' capture and publication of the image itself, and the other rooted in their publication of a false narrative *about* their capture and publication of the image. Distinguishing between these two concepts, Ellorin states:

> "They could have used the true narrative based on the real location of the property in Ramona and that would have been fine.  Plaintiff could have just swallowed the pain from the exposure to the image.  It was this big lie that they have perpetuated up to this time that really affected the Plaintiff."

To draw an admittedly imperfect analogy, it is as though a person alleging that his classic car had been stolen were to contend that he had been injured, not only by the theft itself and by seeing the thief drive his car around the block every day, but also by his discovery that the thief had been telling others a false story about how he had come into possession of the car. If the false story could reasonably be interpreted in some fashion as denigrating the victim, then perhaps it would result in a cause of action— supporting a theory of defamation—that would be separate and apart from the cause of action arising from the original theft.  But in the circumstances presented here, in which no aspersion is being cast on the person claiming to be aggrieved, we fail to see how the injuries Ellorin is attributing to the false narrative discovered in 2019 can reasonably be cleaved off and disassociated from the injuries being attributed to his having been continuously exposed to the image dating as far back as 2001 or 2002.

he and Veronica, had purchased the property in 1994 that the ranch had been included on a registry of film making venues; and there is nothing in the complaint to suggest that Ellorin had reason at that time to suspect that the image might have been captured during the period of his ownership. As Ellorin argues in his opening brief, "[his] distress [at that time] was purely on the viewing of the image and [his and his family's] disgust that they'[d] lost the family ranch and not on any suspicion of fraud."

We do not agree with *Ellorin's* contention because, per the allegations in the complaint, it was long before December 31, 2019, that he had reason to suspect that he had been wronged and to investigate. In the words of the trial court:

> "Ellorin 'suffered' and was 'subjected to distress' and 'emotional torture' over the . . . decade [spanning 2001 or 2002 to 2012]. Ellorin's wife allegedly passed away in 2012 due, in part, to the emotional distress associated with 'her unanswered question why the picture of [their] distressed property was all over the Internet and was used as a Wallpaper by Microsoft without [their] knowledge or permission.' *No later than that point* [*i.e., 2012*], *the facts and circumstances were sufficient to raise a suspicion of wrongdoing.* The complaint was not filed until nine years later—long after the applicable statute of limitations had run." (Italics added.)

22

We agree with the trial court.[14]

Moreover, it is the law in California that, " ' "[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." [Citation.] In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to "show diligence"; "conclusory allegations will not withstand demurrer." ' " (*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 638; accord *NBCUniversal Media, LLC v. Superior Court* (2014) 225 Cal.App.4th 1222, 1232.) Ellorin arguably has shouldered this burden as to requirement number one inasmuch as he has alleged in the complaint that he discovered the false narrative while "trying to change and replace the old image default wallpaper of [his] current wife's laptop computer" on December 31, 2021.

But, as to requirement number two, he has not shouldered his burden at all. To the contrary, he does not allege an inability to have made earlier discovery, and he effectively *concedes* he was *not* diligent at all. That is—notwithstanding his allegation in the complaint that, "[f]rom [2003] on[ward], . . . seeing [the image] over and over again everytime [he] went to a computer shop was torture and unbearable"—Ellorin nonetheless forthrightly

---

14    The trial court also premised its ruling in part on a discrepancy between (1) Ellorin's allegation that he had first learned of the false narrative on December 31, 2019, and (2) the court's conclusion (which Ellorin contends is erroneous) that certain information set forth in printouts of web pages included among the exhibits to the complaint reveal that Ellorin first learned of the false narrative on an earlier date. However, because we conclude *without resorting to those printouts* that the allegations in the complaint defeat Ellorin's invocation of the delayed discovery rule, we find it unnecessary to consider this aspect of the trial court's ruling in our analysis.

states in his opening brief that "*[t]here was no reasonable diligence until . . . 2019*" (italics added) because, prior to that time, he was abroad, had limited means, and prioritized other matters.

> "Appellant . . . was abroad with limited resources, limited means and limited access to the internet and a computer."
>
> "The family and Appellant endured the distress [occasioned by the image] because they were in a different Country and they had limited resources. *There was no reasonable diligence until Appellant was back in the United States in 2019.* In addition, upon arrival in the US, Appellant's priority was not to investigate the . . . issue [of the image of Wild Turkey Hill] but instead to do the following due to the family's recent arrival to the US from living abroad for a long time.
>
> "1) Obtain the much-needed surgery for the reoccurrence of cancer which has metastasized.
>
> "2) Obtain housing for the family.
>
> "3) Enroll the four minor children in school.
>
> "4) Obtain medical insurance and medical checkups for the Appellant's spouse and children.
>
> "5) Purchase a vehicle for the whole family's use.
>
> "As a result, discovery was delayed until December 31, 2019."

(Italics added.)

The importance of each of the afore-listed tasks notwithstanding, it does not excuse, nor does it convert into reasonable diligence, Ellorin's many-years-long delay in investigating a matter that he alleges caused him and his family so great a level of distress; and it does not rise to the level of demonstrating an inability to have made earlier discovery *despite* reasonable diligence. Indeed, long before 2019, Ellorin or someone acting on his behalf could easily have visited one of what he alleges in the complaint were

24

"computer shops which were plenty all around" to perform a simple internet search in an effort to gather information with which to answer what he has referred to as the "unanswered question," dating at least as far back as 2012, of "why the picture of our distressed property was all over the Internet and was used as a Wallpaper by Microsoft without our knowledge and permission."

### 3. Ellorin's Interrogatory Responses, and the Denial of His Request for Leave to File a Brief in Response to the Tentative Ruling

Ellorin argues that the trial court erred because it "did not file, read, and consider" his discovery responses, because it denied him leave to file a brief in response to the tentative ruling, and because it did not file or acknowledge the responsive brief that—the court's denial of leave notwithstanding—he went ahead and attempted to file "anyway." Of course, the inference intended to be drawn from these arguments is that, if only the court *had* considered Ellorin's discovery responses or his further brief, it

would have overruled the demurrer—or perhaps granted him leave to amend the complaint.[15]  But we are not persuaded.

First, it should be noted that (as discussed *ante*) the discovery responses that Ellorin says were not filed *were* in fact filed, and made a part of the record, because they were among the items Ellorin included as exhibits to the second of the two opposition briefs he filed on July 6, 2022.[16]

---

[15]  The defendants correctly point out that the purpose of a demurrer is to test the sufficiency of the allegations that are pleaded in a complaint, not the sufficiency of averments that appear in discovery responses.  However, this is not to say that such averments have no place in proceedings attendant to a demurrer.  After all, it often is based on such averments that courts decide whether leave to amend should be granted.  In this case, Ellorin did not ask the trial court for leave to amend, nor has he requested such leave from this court.  Nonetheless, this court is vested with authority to consider granting leave to amend on its own motion.  (See *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 746 ["[t]he issue of leave to amend is always open on appeal, even if not raised by the plaintiff"].)  But, even in the exercise of this authority, we conclude that a grant of leave to amend in this case would be futile because, for the reasons stated *ante* and *post,* we see no basis upon which Ellorin can argue that he exercised reasonable diligence or that a reasonable person would not have discovered the cause of action he alleges at the time it occurred.  (See generally *Honig v. San Francisco Planning Dept.* (2005) 127 Cal.App.4th 520, 524 [holding "[a] demurrer is properly sustained without leave to amend where the pleading discloses on its face that the action is barred by the applicable statute of limitations"]; *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 231 [affirming denial of leave to amend in circumstances in which "proposed amendment would have been futile because it was barred by the statute of limitations"]).

[16]  We have considered Ellorin's motion to augment the record, and have accepted for filing the reply brief that he submitted in support of that motion.  However, because the discovery responses already are a part of the record before this court, we deny the portion of the motion to augment in which he seeks to place the discovery responses before this court.

26

Second, and more fundamentally, the discovery responses that are the focus of Ellorin's argument do not appear to advance Ellorin's cause. Instead, to the contrary, they appear to *undercut* it. This they do, for example, by contradicting allegations in the complaint that relate to Ellorin's whereabouts and his access to computers during 2018 and 2019[17] and by revealing that many of the types of injuries Ellorin alleges he experienced as a result of discovering the false narrative in 2019 are of a kind with the types of injuries he alleges having experienced previously as a result of viewing the

---

[17] Ellorin alleges in the complaint that he discovered the false narrative on December 31, 2019, having "just returned from abroad after several years," and he insinuates in his briefs on appeal that his failure to discover the false narrative before that date is in significant measure attributable to the fact that, prior to December 31, 2019, he had been "abroad with limited resources, limited means and limited access to the internet and a computer." But his responses to Form Interrogatory Nos. 2.5(b) and 2.5(c), requiring him to "[s]tate [his] residence addresses for the past five years" and "the dates you lived at each address," reveal that he resided continuously at addresses in the United States (in California and Nevada) from some time in 2018 through at least May 1, 2022.

image.[18] Thus the materials Ellorin argues the trial court should have considered in ruling on the demurrer serve only to reinforce—not rebut—the trial court's conclusion that "there is no reasonable possibility that the complaint can be amended to state a timely claim."

As for the denial of Ellorin's request for leave to file a brief in response to the tentative ruling, we are aware of no rule of court requiring a trial court in the jurisdiction in which this case was venued either to post a tentative

_____

[18] Ellorin's responses to Special Interrogatory Nos. 16 and 17, requiring him to "state the type of health problems sustained by you upon which you base your claim in this case" and "the date you first started to experience [those] health problems," list ten "health problems . . . [that Ellorin says he] sustained after [his] Initial Exposure to the Bliss Image on or around 2003." These 10 health problems that Ellorin attributes to his "initial exposure to the . . . image" are "insomnia, depression, anxiety, nightmares, bodily pains, back spasms, headaches, papilliary [*sic*] thyroid cancer, psoriatic arthritis, [and] flare up of previous PTSD from Vietnam war experience." The same two discovery responses list nine of the same ten health problems, plus 12 additional health problems, that Ellorin says he "sustained after [his] discovery of the Fraudulent Bliss Narrative [o]n December 31, 2019." The 21 health problems that Ellorin attributes to his discovery of "the fraudulent Bliss narrative" were: "insomnia, depression, anxiety, anger, mental health disorder, nightmares, bodily pains, increase in cholesterol level, testicular cysts, back spasms, headaches, dizziness, loss of balance, enlarged prostate, urology problems, vision problems, flare up of psoriatic arthritis and joint inflammation, proliferation of lipomas, [and] flare up of previous PTSD from Vietnam war experience." Explaining this overlap, Ellorin states in response to Special Interrogatory No. 4 that: "The recent discovery by the Plaintiff in December 31, 2019, triggered the old distress that the Plaintiff and his family have suffered as a result of their initial exposure to the image abroad." This statement, coupled with the overlap in alleged harms, tends to reinforce allegations in the complaint that refer to the harm Ellorin allegedly experienced on and after December 31, 2019, as an "aggravat[ion]," "[re-]trigger[ing]," "renewal," or other form of intensification or extension or recurrence of harm *previously* caused or exacerbated during prior years as a result of viewing the image.

28

ruling or to permit a litigant to respond in writing to a tentative ruling. Rule 3.1308 of the California Rules of Court, which regulates procedures applicable to tentative rulings, states that it "does not require any judge to issue tentative rulings" (Cal. Rules of Court, rule 3.1308(e)); and rule 2.1.19 of the local rules of the Superior Court in San Diego County states that a civil trial court *"may* issue a tentative ruling in a law and motion matter" and defers the decision whether or not to do so to "the sole discretion of the assigned judge" (Super. Ct. S.D. County, Local Rules, rule 2.1.19(C), italics added). Ellorin was afforded the opportunity—to which *all* litigants or their counsel desiring to respond to a tentative ruling issued in response to a demurrer are afforded—to present oral argument at the hearing on the demurrer. (See Cal. Rules of Court, rule 3.1308(a)(1) [following issuance of a tentative ruling, "oral argument *must* be permitted . . . if a party [gives proper] noti[ce];" italics added].) Indeed, rather than being unfairly *dis*advantaged by not being afforded an opportunity to respond in writing to an advance revelation of the court's tentative reasoning that many courts do not offer at all, Ellorin (and the defendants) instead were advantaged by being exposed in advance of the hearing to how the court was inclined to

rule.[19] The trial court did not abuse its discretion in denying Ellorin leave to file a written response to its tentative ruling.[20]

## B. Entry of Judgment, Not Only for O'Rear, but Also for Microsoft and Gates

As noted above, after sustaining O'Rear's demurrer, the court entered judgment, not only for O'Rear, but also for Microsoft and Gates. Ellorin asserts the trial court should not have entered judgment for Microsoft or Gates because (he says) each of these defendants had failed to timely respond to the complaint and thus was in default.. As discussed *post,* we conclude that Ellorin is correct

---

[19]  Although Ellorin acknowledges having read the tentative ruling two and a half hours before the hearing commenced, he intimates—without explicitly asserting among the grounds for his appeal—that he was impeded in his efforts to communicate with the court during the July 15 proceedings. He states, for example that, "[b]ecause of the COVID-19 pandemic, the Court required . . . hearings [to] be done remotely" and that he "is disabled." However, the in-person appearance at the hearing by two attorneys for O'Rear refutes the notion that remote appearances were required and indicates instead that Ellorin had the option to appear in person, and Ellorin does not state that any disability prevented him from attending and participating in the proceedings in person. As another example, Ellorin states that he "ha[s] a hearing problem" and had a "hard [time] . . . communicat[ing] with the Court[,] especially when speaking on the telephone and [repeatedly] getting interrupted by . . . Microsoft's Counsel." But Ellorin's rendition of statements made by counsel during the proceedings, and of exchanges in which he engaged with the court during the July 15 proceedings, demonstrate that Ellorin had an opportunity, and availed himself of the opportunity, to meaningfully participate in the hearing—even if not to the extent, or in the manner, he might have preferred.

[20]  As noted *ante*, we have considered Ellorin's motion to augment the record, and have accepted for filing the reply brief that he submitted in support of that motion. However, for the reasons set forth *ante,* we deny the portion of the motion to augment in which he seeks to place before this court the brief he attempted to file in response to the trial court's tentative ruling.

in asserting that judgment should not have been entered for Microsoft and Gates. But the grounds on which we so conclude are not those espoused by Ellorin.

Focusing first on the grounds espoused by Ellorin, we note those grounds find no support in the record. Specifically, the record reveals no indication that a default was entered, or even requested, at any time as to any defendant. Indeed, far from indicating that Microsoft or Gates was ever in default, the record instead reveals that Microsoft was actively defending, (see *ante*) and that Gates had not been served,[21] as of the date of entry of judgment.

Despite the absence of support for Ellorin's assertion that Microsoft and Gates were in default, we nonetheless are mindful of case law to the effect that a California trial court, having entered an order sustaining a demurrer, must not enter judgment of dismissal on that order in favor of a defendant who did not join in the demurrer—even when doing so might be prudent as a matter of judicial economy or to avoid additional expense to the parties. (See *Kennedy v. Bank of America* (1965) 237 Cal.App.2d 637, 642 ["Since the only vehicle before the trial court upon which it could act was the demurrer of the [demurring defendant], the judgment of dismissal exceeds the scope of the court's ruling thereon insofar as it purports to . . . dismiss . . . nondemurring defendants."]; but cf. *Pierce v. San Mateo County Sheriff's*

---

[21] The record reveals that Ellorin caused a Civil Proof of Service form to be filed on February 3, 2022 and again on February 16, 2022. But this form did not include the summons among the documents it listed as having been served, nor did it indicate that the individual who took delivery of the listed documents was authorized to accept service on behalf of Gates. Rather, to the contrary, it indicated that that individual had "confirmed [to the process server that] he [wa]s authorized to accept [service] on behalf of The Bill and Melinda Gates Foundation [which is not a party to this case] and *not* [on] . . . Gates . . . personally" (italics added).

*Dept.* (2014) 232 Cal.App.4th 995, 1021 ["where the basis for the successful demurrer applies equally to . . . Doe defendants," dismissal of claims against them may be appropriate].) On the basis of this authority, we conclude that the trial court erred in including Microsoft and Gates in the judgment.

Our conclusion in this regard notwithstanding, we note that the views we express in this opinion—including our views regarding the statute of limitations issues—constitute law of the case governing all further proceedings in the trial court. (See *Morales v. 22nd Dist. Agricultural Assoc.* (2018) 25 Cal.App.5th 85, 98–99 [" ' "[q]uestions presented and decided by [an] appellate court upon appeal from a judgment on demurrer become the law of the case, and are not open to question on a subsequent appeal" unless the evidence " 'is substantially different in a material respect" ' "]; see also *Penziner v. West American Finance Co.* (1937) 10 Cal.2d 160, 169 [when issue has been decided on appeal, parties are estopped from relitigating the same case].) This circumstance, coupled with our observation that all three defendants appear to be similarly (if not identically) situated insofar as the statute of limitations is concerned,[22] suggest that, when this case returns to the trial court, the views we express with regard to statute of limitations issues here may be as dispositive of Ellorin's claims against Microsoft and against Gates (if and when he is properly served) as they are of his claims against O'Rear.

---

[22] We note Microsoft has argued in support of its demurrer that "the [trial] [c]ourt need only apply its prior ruling [on O'Rear's demurrer in order to be able] to sustain [Microsoft's] demurrer."

## V.  Disposition

The judgment is affirmed as to O'Rear, and reversed and remanded for further proceedings as to Microsoft and Gates.  As between Ellorin and O'Rear, O'Rear is entitled to costs on appeal.  As among Ellorin, Microsoft, and Gates, each side shall bear its own costs on appeal.


KELETY, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.